AO 91 (Rev. 11/11) Criminal Complaint



AUSA John D. Mitchell (312) 353-8788

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

WAYNE ADAM TUCKER

CASE NUMBER:

**UNDER SEAL**

**20CR639**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

| Code Sections | Offense Descriptions |
|---|---|
| **Count One**<br>Title 18, United States Code, Section 922(a)(1)(A) | Beginning no later than in April, 2019, and continuing until no earlier than February 8, 2020, at Chicago, in the Northern District of Illinois, and elsewhere, WAYNE ADAM TUCKER, not being a licensed dealer of firearms within the meaning of Chapter 44, Title 18, United States Code, did willfully engage in the business of dealing in firearms. |
| **Count Two**<br>Title 21, United States Code, Sections 841(a)(1) | On or about February 8, 2020, at Chicago, in the Northern District of Illinois, and elsewhere, WAYNE ADAM TUCKER knowingly and intentionally distributed a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of marijuana, a Schedule I Controlled Substance. |

This criminal complaint is based upon these facts:

  X  Continued on the attached sheet.

Ernest Terrell
Special Agent, Federal Bureau of Investigation

Pursuant to Fed. R. Crim. P. 4.1, this complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the complaint and affidavit by telephone.

Date: September 17, 2020

_Judge's signature_

City and state: Chicago, Illinois

M. David Weisman, U.S. Magistrate Judge
_Printed name and title_

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, Ernest Terrell, being duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI")
and have been so employed since approximately September 2017. I am currently
assigned to a criminal enterprise squad that focuses on violent crime taking place on
the west side of Chicago, Illinois.

2.      This affidavit is submitted in support of a criminal complaint alleging
that WAYNE ADAM TUCKER has violated Title 18, United States Code, Section
922(a)(1)(A) and Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D).

3.      The facts set forth in this affidavit are based on my personal knowledge,
my training and experience, and information provided to me by other law
enforcement personnel. Because this affidavit is being submitted for the limited
purpose of establishing probable cause in support of a criminal complaint charging
TUCKER with engaging in the unlicensed business of dealing firearms and drug-
trafficking, I have not included each and every fact known to me concerning this
investigation. I have set forth only the facts that I believe are necessary to establish
probable cause to believe that the defendant committed the offenses alleged in the
complaint.

## I.      Facts Supporting Probable Cause

4.      In summary, and as described in more detail below, WAYNE TUCKER carried out four unlicensed sales of firearms to a confidential source ("CS-1")[1] on or about April 28, 2019, August 17, 2019, November 16, 2019, and February 8, 2020. TUCKER also sold approximately one pound of marijuana to CS-1 on or about February 8, 2020. In total, TUCKER sold approximately 39 firearms, including assault rifles pictured below, to CS-1. TUCKER explained to CS-1, in recorded conversations, that he had several people supplying him with firearms purchased at gun shows, and TUCKER continued to sell firearms to CS-1 even after CS-1 had told TUCKER that CS-1 had a prior gun conviction.

5.      The Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF") Federal Firearms Licensing Center ("FFLC") issues and renews federal firearms licenses ("FFL"). The FFLC reviews and acts upon all applications for FFLs, coordinates the inspection of applicants with ATF field offices, and performs background checks on all responsible persons. The FFLC maintains the Firearms Licensing System ("FLS") database of FFLs. According to a search of the FLS, no FFL was issued to TUCKER between April 2019 and August 2020.

---

[1] CS-1 has been a confidential informant for the FBI since approximately April 2019. CS-1 has been cooperating with law enforcement in the hope of receiving favorable treatment of charges made against CS-1 for manufacturing or delivery of a controlled substance. CS-1 began receiving financial compensation from the FBI in January, 2020, and has received approximately $3,400. Information provided by CS-1 has been reliable and credible, and certain information has been corroborated by other sources, including consensually recorded calls, surveillance, and the purchase of firearms, including as described below. According to law enforcement databases, CS-1 has a criminal record that includes the following convictions: unlawful possession of a weapon by a felon, aggravated unlawful use of a weapon, possession of a controlled substance, possession of firearm in public.

### A. TUCKER's Unlicensed Firearms Sale to CS-1 on April 28, 2019

6.      During April 2019, CS-1 informed law enforcement that an individual named WAYNE ADAM TUCKER contacted CS-1 about firearms that TUCKER had to sell. According to CS-1, CS-1 has known TUCKER since the end of 2017.

7.      On or about April 12, 2019, CS-1 informed law enforcement that TUCKER contacted CS-1 via text message, from telephone number 260-564-xxxx (the "Tucker Phone"), with photographs of firearms and a price for the purchase of the firearms. At that time, law enforcement showed CS-1 a photograph of TUCKER from the Indiana Bureau of Motor Vehicles ("BMV"), and CS-1 identified TUCKER as the individual who had texted CS-1 from the Tucker Phone about purchasing firearms.[2]

8.      The image below was sent by TUCKER from the Tucker Phone to CS-1 on April 5, 2019. CS-1 texted "Price" to the Tucker Phone, and TUCKER responded by texting "1950."[3]

---

[2] Law enforcement also identified TUCKER as CS-1's firearms contact and as the user of the Tucker Phone in the following ways: TUCKER has been the only subscriber of the Tucker Phone since July 3, 2009, according to records from Verizon Wireless, and, as is described in more detail below, the user of the Tucker Phone used that phone to arrange in-person meetings with CS-1 on April 28, August 17, and November 16, 2019, and February 8, 2020, and at those meetings law enforcement conducting surveillance saw that the man who showed up and sold firearms to CS-1 matched the physical likeness of TUCKER in his BMV photograph.

[3] Some of the consensually recorded and texted conversations in the investigation are summarized in this Affidavit. The language that is quoted from the recorded conversations throughout the Affidavit is based upon a preliminary review of the recorded conversations, not final transcripts. The texted conversations were copied as written by TUCKER or CS-1; in some instances in the Affidavit, punctuation was added for ease of reading. These summaries do not include all statements or topics covered during the course of the recorded conversations. At various points in the Affidavit, I have indicated (sometimes in brackets) my interpretation of words and phrases used in the recorded conversations. My interpretations are based on information received from confidential sources, the contents and context of the recorded conversations, events that took place before and after the



9.      Between on or about April 12 and on or about April 28, 2019, at the direction of law enforcement, CS-1 set up a firearms purchase through text messages exchanged with TUCKER at the Tucker Phone.

10.     On or about April 12, 2019, using the Tucker Phone, TUCKER texted CS-1 the photograph below and the following message: "This is to a ours [two "ARs," *i.e.*, assault rifles] and one AK [AK-47 rifle] with two extended round clips and 100 rounds of ammunition for an AK." TUCKER also texted, "It's is a package deal for 2200 [$2,200]."

---

conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.



11.     CS-1 responded by texting, "Ok." TUCKER then texted, "There was another guy that was wanting this stuff he must be having trouble getting his money around and I'm going to move [sell] it if the first person that comes up with the money."

12.     TUCKER and CS-1 agreed to meet at Retail Store A at 7700 Cabela Drive in Hammond, Indiana, on April 28, 2019. On that day at approximately 10:35 a.m., at the direction of law enforcement, CS-1 sent a text message to TUCKER at the Tucker Phone. CS-1 texted, "How ya looking im 45 minutes away," to which TUCKER responded with the text, "I'm about the same maybe a half hour I might be there a little bit before 45 minutes."

13.     Before CS-1 met TUCKER, law enforcement officers searched CS-1 and CS-1's vehicle at a staging area for the presence of contraband and United States currency and found none. Officers provided CS-1 with $3,000 in pre-recorded buy funds and equipped CS-1 with an audiovisual recording device. At approximately

11:06 a.m., CS-1 departed the staging area for Retail Store A while under continuous surveillance.

14.     CS-1 received a telephone call from the Tucker Phone at approximately 11:09 a.m.  TUCKER told CS-1, in sum and substance, that he was driving a tan Chevy Impala and was parked in the lot of Retail Store A.

15.     CS-1 arrived at Retail Store A at approximately 11:12 a.m. and, about two minutes later, entered the tan Chevy Impala pictured below. The Chevy had Indiana license plates registered in TUCKER's name. Inside TUCKER's Chevy, according to CS-1, CS-1 handed $2,895 of the pre-recorded buy funds to TUCKER.



16.     CS-1 and TUCKER exited TUCKER's Chevy at approximately 11:17 a.m., walked to the trunk of the vehicle, and began unloading firearms from the trunk and transferring the firearms to CS-1's vehicle. During this time, law enforcement observed TUCKER, who was wearing a dark jacket over a red polo shirt. Below are

still images of TUCKER from video captured by CS-1's recording device during the firearms transaction.[4]





17.     In exchange for the money provided by CS-1, TUCKER transferred the following five firearms and ammunition from the trunk of his car to the back seat of CS-1's vehicle:

---

[4] The time and date on the images are inaccurate due to a device malfunction.

7

    a.    one I. O. Inc., Sporter 7.62mm rifle, bearing serial number S011620;

    b.    one Ruger AR-556, 5.56mm rifle, bearing serial number 852-67824;

    c.    one Karri's Gun, KG15, 5.56mm rifle, bearing serial number 03354;

    d.    one Smith & Wesson M&P Shield, 9mm pistol, bearing serial number HDH3991;

    e.    one Keltec, P-32, .32 mm pistol, bearing serial number CQ306, with a market value of $239.99; and

    f.    46 rounds of .32m ammunition, 100 rounds of .223 rounds of ammunition, 100 rounds of 9mm ammunition, and 100 rounds of 7.62 ammunition.

18.    TUCKER made the following statements, among others, during the firearms transaction, according to a review of the audio captured by CS-1's recording device:

    a.    "Man I've been moving quite a little bit of shit up through there [Chicago] you know he call something, I start looking for it. 'Cause you know what I'm doing, I got several people that go around down here [Indiana], they go around and they, nothings hot [stolen] you know, they just go to these gun shows and different people, and that's been bought that's because they don't want anybody to know who's got it [firearm]."

    b.    "As long as somebody else has bought it, somebody else has filled out the background check and everything and they got and they resale it. Fuck, nobody knows anything about it."

    c.    "And I don't want the fucking hot [stolen] shit because then if you get caught that you're pissed off or whatever."

    d.    "You know if I, if I got something that's hot [stolen] I'll tell you man, that way you know."

    e.    "That you're taking a risk, because you know they are really down on that but all this stuff, I try to get all that can be registered if

they want. It's just stuff that's been bought and nobody knows because it's been cash sale on and on."

f. "[T]hat's what I like because that way the feds don't like it, or don't know anything about it and that way if you fucking get caught with it, it's not illegal, so yeah, I know you might be in trouble the other way which I don't want to know, not implying but you know at least it's not a stolen weapon."

19. The firearms transaction between TUCKER and CS-1 concluded at approximately 11:22 a.m. CS-1 entered CS-1's vehicle and drove towards the staging area while under surveillance.

20. CS-1 arrived at the staging location at approximately 11:29 a.m., and law enforcement took possession of the firearms listed above in Paragraph 17 and pictured below. Law enforcement searched CS-1 and CS-1's vehicle for the presence of any contraband and found none. Law enforcement also confirmed that CS-1 had given $2,895 in United State currency to TUCKER for those firearms and took possession of the remaining $105 from CS-1.



**B.     TUCKER's Unlicensed Firearms Sale to CS-1 on August 17, 2019**

21.     Between on or about July 18 and on or about August 17, 2019, at the direction of law enforcement, CS-1 set up a second firearms purchase from TUCKER through text messages exchanged with the Tucker Phone.

22.     In sum and substance, CS-1 asked TUCKER whether he still had the package of firearms, and TUCKER, using the Tucker Phone, sent photographs of the firearms, a firearms list, and the price of the package.

23.     On August 10, 2019, TUCKER, using the Tucker Phone, texted CS-1, "3850. For 9 toys [firearms]. The AR Colt is 1250. There is a cheaper AR for 750." As shown below, TUCKER texted "12 guns in all" and a list and photograph of firearms.



24. On or about August 16, 2019, at the direction of law enforcement, CS-1 exchanged the following text messages with TUCKER at the Tucker Phone:

CS-1: "Can you come a lil closer it would be greatly appreciated"

TUCKER: "Like where"

CS-1: "147 Maynard's right off high way"

TUCKER: "Is that across the Illinois line"

CS-1: "Lil bit"

TUCKER: "Right off Interstate 94"

CS-1: "Yeah"

CS-1: "14975 Lincoln"

TUCKER: "Ok"

25.     Retail Store B is located at 14975 Lincoln Avenue in Dolton, Illinois, west of the Illinois-Indiana state line.

26.     The next day, on or about August 17, 2019, CS-1 received the following text message from the Tucker Phone at approximately 7:32 a.m.: "I am loaded and I'm on my way."

27.     Before CS-1 met TUCKER, law enforcement officers searched CS-1 and CS-1's vehicle at a staging area for the presence of contraband and United States currency and found none. Officers provided CS-1 with $5,000 in pre-recorded buy funds and equipped CS-1 with an audiovisual recording device. At approximately 10:11 a.m., CS-1 departed the staging area for Retail Store B while under continuous surveillance.

28.     CS-1 arrived at Retail Store B at approximately 10:19 a.m. CS-1 and TUCKER met, walked to the trunk of TUCKER's vehicle, and began moving boxes from TUCKER's vehicle into CS-1's vehicle.

29.     CS-1 and TUCKER entered TUCKER's vehicle at approximately 10:21 a.m. According to CS-1 and a recording of the meeting, while CS-1 and TUCKER were inside TUCKER's vehicle, CS-1 handed United States currency to TUCKER in exchange for the firearms that the two had transferred in boxes from TUCKER's vehicle to CS-1's vehicle.

30.     TUCKER and CS-1 had the following exchange, among others, during the firearms transaction, according to a review of the audio captured by CS-1's recording device:

TUCKER:     "The weed and those guns usually keep me pretty busy and right now is a good time now. Here's the thing, if you want more this, this guy is out right at a gun store, a gun show buying guns."

CS-1:        "Ok."

TUCKER:     "He's going to Ohio next month, September. September he's going to Ohio they expect, he said, he told me this morning, he said, between him and his son they expect to be buying about 800 more guns."

CS-1:        "Ah shit, ok."

TUCKER:     "Now there'll be long rifles and, but, I mean a lot, there again if you have some specialty you want to look at you text me, I'm gonna get with this guy and like I said, here like the next months there is some big ass gun shows around and that's what they're looking for."

31.     Later in their conversation, TUCKER and CS-1 talked about firearm laws, and CS-1 informed TUCKER as follows:

CS-1:        "You ain't got nothing, that could be 5 years ago. An old ass conviction, they still will say he's armed and dangerous and I'm like, armed and dangerous! I was convicted of that shit in 2003.[5] And I wasn't, I was just carrying the damn gun I wasn't shooting it."

TUCKER:     "Yeah, so and now you're armed and dangerous because you were just carrying it and that's bull shit."

32.     Later in their conversation, TUCKER said to CS-1, "I don't agree with that. Because if it's not, I understand the felon and a gun, I got all that stuff. But the problem is it's not a fuck, ah, like a violent crime when they got the felony. What make it, and if they're carrying a gun and there's no shots fired, and they just had it

---

[5] According to CS-1's criminal history, CS-1 was convicted of being a felon in possession of a firearm in 2003 and sentenced to two years' imprisonment.

for protection or whatever, what make it fuck, to it's not violent, that's not a violent crime."

33.     CS-1 exited TUCKER's vehicle at approximately 10:53 a.m. and continued speaking with TUCKER through a window, as pictured below.



34.     Both TUCKER and CS-1 left Retail Store B at approximately 10:59 a.m.

35.     CS-1 arrived at the staging location at approximately 11:10 a.m., and there, from CS-1's vehicle, law enforcement took possession of the 12 firearms listed below and pictured in the image following this paragraph, along with the ammunition listed below. Law enforcement searched CS-1 and CS-1's vehicle for the presence of any contraband and found none. Law enforcement also confirmed that CS-1 had given $5,000 in United States currency to TUCKER in exchange for those firearms.

        a.      one Ruger, P95DC, 9mm, bearing serial number 312-29936;

        b.      one Ruger, P90DC, 45cal, bearing serial number 661-62349;

c.　　one Smith & Wesson, SD9VE, 9mm, bearing serial number FWX9842;

d.　　one Smith & Wesson, M&P Shield, 9mm, bearing serial number HPV6441;

e.　　one Taurus, R351, 38cal, bearing serial number IO80910;

f.　　one Ruger, P95DC, 9mm, bearing serial number 312-05859;

g.　　one Beretta, PX4 Storm, 40 caliber, bearing serial number PZ35380;

h.　　one Smith & Wesson, M&P Bodyguard, 380cal, bearing serial number EAE0601;

i.　　one Smith & Wesson, M&P Bodyguard, 380cal, bearing serial number KEV6061;

j.　　one Taurus, 85 Ultralite, 38 caliber, bearing serial number EU23651;

k.　　one Anderson, AM-15, 556 caliber, bearing serial number 14052247;

l.　　one Ruger, 9E, 9mm, bearing serial number 335-52006; and

m.　　50 .45mm rounds of ammunition, 50 full metal jacket .380 rounds of ammunition, 50 9mm rounds of ammunition, 20 sporting rifle 5.56mm rounds of ammunition, and 38 Winchester SXT .40mm rounds of ammunitions.



**C.    TUCKER's Unlicensed Firearms Sale to CS-1 on November 16, 2019**

36.    On or about August 19, 2019, using the Tucker Phone, TUCKER texted the following photograph, showing a list of firearms and corresponding prices, to CS-1, who responded, "Okay great."

16



37.     Between on or about August 19 and on or about November 16, 2019, at the direction of law enforcement, CS-1 set up a third firearms purchase from TUCKER through text messages exchanged with the Tucker Phone and also arranged with TUCKER to buy controlled substances from him.

38.     On or about November 13, 2019, TUCKER, using the Tucker Phone, texted the following image listing firearms to CS-1:

| | |
|---|---|
| Colt 1911 - MK 4 | 45ACP |
| ATI / RI 1911 | 45ACP |
| S&W SVD40 | 40 cal |
| S&W SVD40 | 40 cal |
| S&W SVD40 | 40 cal |
| Taurus GC2 | 40 cal |
| Taurus GC2 | 9mm |
| EAA Tanfoglio - Pink | 9mm |
| Star 1911 BA | 9mm |
| Ruger P95 Stainless | 9mm |
| Taurus TCP | 380 |
| BERSA 380 | 380 |

39.    On or about November 13, 2019, at the direction of law enforcement, CS-1 exchanged the following text messages with TUCKER at the Tucker Phone:

TUCKER:    "And 1ar [assault rifle] can go with that package"

CS-1:    "Okay"

CS-1:    "You got everything together right herb [marijuana] and pound of meth"

TUCKER:    "I have a sample of the math [meth] before I go get a pound of want you to check it out and make sure that it's you're okay what and as far as the green stuff I can bring four or five different flavors that would equal a pound that you can check out and we can go from there"

CS-1:    "Ok I had ppl [people] waiting for the pound of meth. So that means the price goes down about 6000 right"

18

TUCKER:     "yes I wanted you to check this quality of meth out before I bring you a pound the same way with green stuff I can bring a pound with me and you can check out the different flavors and then we can go from there as far as the green stuff and the meth"

TUCKER:     "The gun package is a little bit different because some of that other stuff was sold it is 52 [$5,200] on that gun package with the AR and that would be with some ammo"

40.     On or about November 15, 2019, TUCKER, using the Tucker Phone, also sent CS-1 the following image of a package of firearms:



41.     On or about November 15, 2019, at the direction of law enforcement, CS-1 texted TUCKER at the Tucker Phone: "Time for Saturday."

42.     TUCKER responded with the following text: "I have the gun package in the ammo locked in a 5300 [$5,300] I'm working on locking in this dream bud because the guys inventory keeps changing."

43.     CS-1 texted, "Okay so what time you thinking so he won't Change up."

44.     TUCKER texted, "I'm not sure about work yet they talk and they may work till noon so I don't know I won't know for a few hours on that."

45.     On or about November 16, 2019, at approximately 6:55 a.m., CS-1 received the following text message from TUCKER, who was using the Tucker Phone: "Good morning do you want me to bring that Glock on top of the pack gun package," to which CS-1, under the direction of law enforcement, responded with the text, "Good Morning how much."

46.     Through text messages, TUCKER, using the Tucker Phone, and CS-1 then settled on a price of $475 for the additional firearm ("that Glock on top of the pack gun package"). The total price for the firearms package and drugs being offered by TUCKER was $5,775.

47.     By text messages, TUCKER, using the Tucker Phone, and CS-1 agreed to meet on November 16, 2019, at the same Retail Store B in Dolton, Illinois, where they had conducted the second firearms transaction on August 17, 2019. On November 16 at approximately 9:46 a.m., law enforcement officers searched CS-1 and CS-1's vehicle at a staging area for the presence of contraband and United States currency and found none. Officers equipped CS-1 with an audiovisual recording device and provided CS-1 with $6,000 in pre-recorded buy funds to use to conduct the controlled firearm and drug purchase from TUCKER.

48.     CS-1 departed the staging area at approximately 10:31 a.m. and drove to Retail Store B while under continuous surveillance. Law enforcement observed TUCKER's tan Chevy Impala park in Retail Store B's lot at approximately 10:31 a.m.,

observed CS-1 park next to TUCKER's car at approximately 10:40 a.m., observed TUCKER and CS-1 moving boxes from the trunk of TUCKER's car into the back seat of CS-1's vehicle at approximately 10:46 a.m., and observed TUCKER close his trunk and both CS-1 and TUCKER enter TUCKER's car at approximately 10:47 a.m.

49.     TUCKER and CS-1 had the following exchange, among others, during the transaction, according to a review of the audio captured by CS-1's recording device:

| CS-1: | "Yeah, my boy will love this [a firearm]. A mother fucker tried to take his head off at the gas station." |
|---|---|
| CS-1: | "Oh this nice, what is this? A 40 [caliber firearm]?" |
| TUCKER: | "Yup, should be a 40. You got a bunch of 40s this go round. And I don't have any more. That guy don't have any more 40s right now. Trying to save 40s because you like 40s so well. You said they move for ya." |
| CS-1: | "They definitely do." |

50.     CS-1 exited TUCKER's vehicle at approximately 11:17 a.m. and entered CS-1's vehicle. Law enforcement observed TUCKER and CS-1 leaving Retail Store B at approximately 11:19 a.m.

51.     CS-1 arrived at the staging location at approximately 11:31 a.m., and there law enforcement took possession of the boxes containing the 14 firearms listed below and pictured in the image following this paragraph, along with the ammunition listed below. Law enforcement took possession from CS-1 of the sample of suspected methamphetamine that TUCKER had given to CS-1 in TUCKER's vehicle. The sample provided by TUCKER was a crystal-like substance wrapped in a small plastic

baggie inside a pill bottle and is awaiting laboratory testing to confirm it is methamphetamine. Law enforcement also took possession from CS-1 of a sample of suspected marijuana that TUCKER had given to CS-1 in two Ziploc bags. According to the results of DEA laboratory testing, those Ziploc bags contained approximately 26.7 grams of marijuana. Law enforcement searched CS-1 and CS-1's vehicle for the presence of any other contraband and found none. Law enforcement also confirmed that CS-1 had given $5,775 in United States currency to TUCKER for the listed firearms.

     a.    One Del-Ton Inc, DTI-15, 556 caliber rifle, bearing serial number DTI-5141492;

     b.    one Glock, 22, 40 caliber, bearing serial number PZL095;

     c.    one Colt, Combat Commander, 45 caliber, bearing serial number FC14126E;

     d.    two Smith & Wesson, SD40VE, 40 caliber, bearing serial numbers FZT5552 and FYV6021;

     e.    one Smith & Wesson, SD40, 40 caliber, bearing serial number FBH1237;

     f.    two STAR, Super, 9mm, bearing serial numbers 50210 and 45736;

     g.    one Taurus, P738 TCP, .380 caliber, bearing serial number 33411E;

     h.    one Taurus, G2C, 9mm, bearing serial number TMB22937;

     i.    one Shooter Arms, M1911 Military, 45 caliber, bearing serial number ML108299;

     j.    one Smith & Wesson, M&P Bodyguard 380 caliber, bearing serial number KCE6527;

     k.    one Tanfoglio, Witness P Carry, 9mm, bearing serial number MT10242;

l.    one Taurus, G2C, 40 caliber, bearing serial number SMA10094; and

m.    250 9mm Luger rounds of ammunition and 23 miscellaneous .40mm rounds of ammunition.



52.    As stated above in footnote 6, according to CS-1's criminal history, CS-1 was convicted of being a felon in possession of a firearm in 2003 and sentenced to two years' imprisonment.

**D.    TUCKER Used the Tucker Phone on November 19-20, 2019, and December 19, 2019, to Arrange the Sale of Narcotics to CS-1.**

53.    On or about November 19, 2019, TUCKER, using the Tucker Phone, sent the following text to CS-1: "Any feedback on the samples that you got." At the direction of law enforcement, CS-1 replied, "Love." TUCKER, using the Tucker Phone, and CS-1 then exchanged the following text messages:

TUCKER:    "So did u want the lb of meth then"

CS-1:           "When"

TUCKER:      "I might be able to have it over the weekend I can check and see
             when I can go get it"

CS-1:           "Price"

TUCKER:      "6"

CS-1:           "See if you can get a cheaper price"

CS-1:           "4000 or 4500"

TUCKER:      "I will try"

CS-1:           "Ok Great"

54.     On or about November 20, 2019, TUCKER, using the Tucker Phone,
texted CS-1, "5500 is the best I can do."

55.     On or about December 19, 2019, at the direction of law enforcement, CS-
1 sent the following texts to the Tucker Phone: "Good Morning," "Are there any
holiday packages," "And I still need some meth." Using the Tucker Phone, TUCKER
replied, "Good morning the best I can do on the meth is 5500 a pound and I can try to
get a package put together for you."

56.     TUCKER, using the Tucker Phone, also texted to CS-1, "Let me know if
you want that meth I can run that up over the weekend possibly or the first of the
week."

57.     A deal between TUCKER and CS-1 did not take place the following
weekend or week.

**E.     TUCKER Used the Tucker Phone on January 21 and 27, 2020, to Arrange the Sale of Firearms and Narcotics to CS-1.**

58.     On or about January 21, 2020, at the direction of law enforcement, CS-1 exchanged the following text messages with TUCKER at the Tucker Phone:

CS-1:          "Good Morning"

TUCKER:     "What's up"

CS-1:          "Tell me something good"

TUCKER:     "There r some toys [guns] available"

CS-1:          "Okay and the meth"

CS-1:          "We can do couple 40s some 9mm couple riffles and a pound this weekend or next"

CS-1:          "Need a package deal"

TUCKER:     "Last I heard it was 5500"

CS-1:          "I remember"

TUCKER:     "Yes I will get u some pics"

CS-1:          "Ok"

TUCKER:     "Any ARs [assault rifles]"

CS-1:          "That's cool"

CS-1:          "How much will the AR's run"

TUCKER:     "I think there is four of them that's available if you buy all four I know it was going to be a little bit cheaper"

CS-1:          "How much cheaper"

TUCKER:     "I thought he was saying like it was going to be about two hundred and fifty bucks cheaper if you bought all four of them then if you did individually"

25

CS-1:       "So how much is one of them"

TUCKER:     "Around 700 to 800"

CS-1:       "Okay if I grab all 4 what else can you put together to make the package"

TUCKER:     "I will check"

CS-1:       "Okay"

59.     On or about January 27, 2020, at the direction of law enforcement, CS-1 exchanged the following text messages with TUCKER at the Tucker Phone:

CS-1:       "Good Morning"

CS-1:       "When u get a chance can u send me a picture of the AR's"

TUCKER:     "Yes and the hand guns"

CS-1:       "Okay"

60.     TUCKER, using the Tucker Phone, then texted the following images and messages to CS-1:



TUCKER:     "DPMS lower with 7.62x39 upper"

TUCKER:     "Palmeto state armory multi lower with a"

TUCKER:     ".223 Wylde SS upper"



TUCKER:     "Palmetto state armory multi lower with a 450 bushmaster upper"

TUCKER:     "Smith M&P 223/556 new in box"

TUCKER:     "That is the top one"







**F.    TUCKER Used the Tucker Phone between January 30 and February 7, 2020, to Arrange the Sale of Firearms and Narcotics to CS-1.**

61.    On or about January 30, 2020, at the direction of law enforcement, CS-1 exchanged the following text messages with TUCKER at the Tucker Phone:

CS-1:    "Yo any word on price"

TUCKER:    "What was you wanting all them pistols I sent you and all the AR's and that pound of meth"

CS-1:    "Yeah"

TUCKER:    "all right let me talk to him I have not said anything last couple days I've been busy doing other stuff and kind of forgot about it I'm sorry"

29

62.     On or about January 30, 2020, at approximately 5:41 p.m., TUCKER, using the Tucker Phone, exchanged the following text messages with CS-1 about the price and date of delivery:

TUCKER:     "10300 4 AR rifles 4 handguns 45 caliber 1 lb of meth"

CS-1:     "Okay cool"

CS-1:     "I have a funerals to go to this weekend next weekend is cool for me Saturday"

TUCKER:     "I need a couple days for the mouth (meth) if you with it this weekend I need a yes or no today so I can have it Saturday"

CS-1:     "I want everything"

TUCKER:     "Meth"

CS-1:     "Next Saturday"

TUCKER:     "Do you want to do it Saturday"

TUCKER:     "Ok I will set it up for next Saturday then"

CS-1:     "Okay thanks"

TUCKER:     "I was supposed to ask you if you wanted some of the marijuana can go for 2100 a pound"

CS-1:     "I can get one with order maybe more next time it's the same as you gave me before"

CS-1:     "That's 12,400"

CS-1:     "Price correct"

TUCKER:     "Yes"

63.     On or about February 1, 2020, TUCKER, using the Tucker Phone, texted CS-1, "I put your order in, today," to which CS-1 responded by text, "Okay great."

64.     On or about February 7, 2020, TUCKER, using the Tucker Phone, exchanged the following text messages with CS-1:

TUCKER:     "have everything but the meth the guy just text me then called and said that it would have to be next weekend because he didn't get a large enough shipment in"

TUCKER:     "We can do part of this Saturday if you want of if you want to hold off and get everything all at once that would be next Saturday"

CS-1:       "Can u get half"

CS-1:       "Pound meth"

TUCKER:     "I will ask"

TUCKER:     "No meth till next Friday"

65.     Later on or about February 7, 2020, CS-1 and TUCKER, using the Tucker Phone, exchanged the following text messages about the price:

CS-1:       "Price"

CS-1:       "How much is my total"

TUCKER:     "6900"

CS-1:       "Okay see you tomorrow"

TUCKER:     "Ok"

## G.     TUCKER's Unlicensed Firearm and Drug Sales to CS-1 on February 8, 2020

66.     On or about February 8, 2020, TUCKER, using the Tucker Phone, sent the following text messages to CS-1:

TUCKER:     "Good morning I have loaded the stuff and I have just left I did pick up a hundred dollars' worth of ammo that I will split the cost on it with you for the inconvenience of having to drive this Saturday and next Saturday"

31

TUCKER:  "The one has a box with it the other ones have gun cases soft gun cases that I need back so you know if you might want to throw a blanket or something to cove[r] up"

67.     By text messages, TUCKER, using the Tucker Phone, and CS-1 agreed to meet on February 8, 2020, at the same Retail Store B in Dolton, Illinois, where they had conducted the second firearms transaction on August 17, 2019, and the third firearms transaction on November 16, 2020.

68.     On February 8, 2020, at approximately 9:21 a.m., law enforcement officers searched CS-1 and CS-1's vehicle at a staging area for the presence of contraband and United States currency and found none. Officers equipped CS-1 with an audiovisual recording device and provided CS-1 with $7,000 in pre-recorded buy funds to use to conduct the controlled firearm and drug purchase from TUCKER.

69.     Law enforcement observed TUCKER's tan Chevy Impala park in Retail Store B's lot at approximately 10:25 a.m. on February 8, 2020. CS-1 departed the staging area at approximately 10:39 a.m. and drove to Retail Store B while under continuous surveillance. Law enforcement observed CS-1 park next to TUCKER's car at approximately 10:51 a.m. Law enforcement then observed TUCKER and CS-1 moving boxes from the trunk of TUCKER's car into the back seat of CS-1's vehicle at approximately 10:53 a.m. At approximately 11:00 a.m., law enforcement observed TUCKER close his trunk and both CS-1 and TUCKER enter TUCKER's car.

70.     TUCKER and CS-1 had the following exchange, among others, during the transaction, according to a review of the audio captured by CS-1's recording device:

TUCKER: "Um . . . I ain't heard much about what's goin' on there. It's been kinda fuckin' low key there—I don't know. Um on the shelves when you get home, them 450 (.450 caliber) Bushmaster and them 7 point 62s—I don't know how many more you want of them but I, I don't have any at my house. I got 450s at home in my house that I got. If you want more of that, I will order some more ammo online—it's cheaper. And I'll have it shipped to my house and then when I come up here—I don't know if I can have it next week but I'll have it by next month. So you decide—and like I said, now I can get you some 450s I can just take 'em out—cuz I got 300 rounds on hand cuz I own one of them 450s."

CS-1: "Oh, okay yeah."

TUCKER: "And I like 'em . . . I'm tellin' you dude that mother fucker kicks like a son of a bitch. I mean it will shoot right through if, if you're tryin' shoot through cars that mother fucker . . ."

CS-1: "It's gone"

TUCKER: "Oh dude it will shoot right through the cars"

CS-1: "Fuck up a motor, huh?"

TUCKER: "Oh it will fuck anybody—it will fuck the motor up really bad if you're tryin' disable that car. I mean, it will fuck it up. That car won't go very far."

71. Law enforcement observed CS-1 exit TUCKER's vehicle at approximately 11:20 a.m. and enter CS-1's vehicle. Law enforcement then observed TUCKER and CS-1 leaving Retail Store B at approximately 11:22 a.m.

72. CS-1 arrived at the staging location at approximately 11:37 a.m., and there law enforcement took possession from CS-1 of boxes given to CS-1 by TUCKER and containing the eight firearms listed below and pictured in the image following this paragraph, along with the ammunition listed below. Law enforcement also took possession from CS-1 of a white bucket that TUCKER had given to CS-1. The white

bucket, shown in both of the images immediately below, contained, packaged inside four large gallon Ziploc bags, a green leafy substance consistent with the appearance of marijuana. According to the results of DEA laboratory testing, two of those four Ziploc bags contained approximately 215.2 grams of marijuana. Law enforcement searched CS-1 and CS-1's vehicle for the presence of any other contraband and found none. Law enforcement also confirmed that CS-1 had given $6,950 in United States currency to TUCKER for the listed firearms, drugs, and ammunition.

a. one Smith & Wesson MP 15 .556 caliber rifle, bearing serial number TH78476;

b. one Panther Arms A-15 multi-caliber rifle, bearing serial number DKF915605;

c. one Anderson Manufacturing AM-15 multi-caliber rifle, bearing serial number 17191978;

d. one Ruger AR-556 .556 caliber rifle, bearing serial number 85429186;

e. one Walther PPQ .45 caliber pistol, bearing serial number FCN4643;

f. one Auto Ordinance, Thompson 1911 .45 caliber pistol, bearing serial number AOC13317;

g. one Ruger P97DC .45 caliber pistol, bearing serial number 66309463;

h. one Smith & Wesson Chief Special .45 caliber pistol, bearing serial number EKY3895; and

i. 20 rounds of 450 Bushmaster ammunition, approximately 40 rounds of .223 ammunitions, 40 rounds of 7.62 ammunition, and 150 rounds of .45mm ammunition.





## II.     Conclusion

73.     Based on the foregoing, I respectfully submit there is probable cause to

believe that TUCKER (a) not being a licensed dealer of firearms within the meaning

of Chapter 44, Title 18, United States Code, did willfully engage in the business of

dealing in firearms beginning no later than in April, 2019, and continuing until no earlier than on or about February 8, 2020, in violation of Title 18, United States Code, Section 922(a)(1)(A); and (b) knowingly and intentionally distributed a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of marijuana, a Schedule I Controlled Substance, on or about February 8, 2020, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D).

FURTHER AFFIANT SAYETH NOT.

Ernest Terrell
Special Agent, Federal Bureau of
Investigation

SWORN TO AND AFFIRMED by telephone on September 17, 2020.

Honorable M. David Weisman
United States Magistrate Judge

36